In the Matter of DAVID E. BERG, Petitioner, against HAROLD W. MARSH et al., as Commissioners of the Municipal Civil Service Commission of the City of New York, Respondents.

First Department, May 19, 1944.

*Samuel W. Sherman* for petitioner.

*Murray Sendler* of counsel (*James Hall Prothero* with him on the brief; *Ignatius M. Wilkinson, Corporation Counsel*), for respondents.

TOWNLEY, J. Petitioner was accused of having willfully made false public statements impugning the integrity of the Commission to the prejudice of the public service. The charges arose out of testimony given on February 10, 1941, in response to a subpœna before a Councilmanic Investigation Committee. After a hearing he was dismissed.

On March 16, 1938, an open competitive examination for Radio Announcer was ordered by the Municipal Civil Service Commission. The petitioner Berg, an examiner on a per diem basis employed by the Commission, was placed in charge of this examination and assigned to prepare questions for it. A provisional junior examiner named Morrow assisted him. On December 14, 1938, two days before the examination was to be held, at about 5:00 P. M. that day, it is said that an examiner named Farrell and the Acting Assistant Director of Examinations, one Stern, found two sets of examination papers left unguarded in

the semi-public corridor outside of the examiner's office. An inquiry was held and Berg denied having anything to do with leaving them there. The Commission did not fix responsibility for the occurrence. Berg was not found guilty of any negligence. He was suspended for five days, however, on the theory that since he was in charge he was absolutely responsible for anything that occurred regardless of any element of negligence.

At the hearing that was held at this time (December 22, 1938) Commissioner Morton asked Berg to tell the whole story of what happened to the papers. After stating that Morrow had refused to carry any more of the papers, Berg said he decided to carry them into the storeroom himself. He described in great detail whom he had left in the mimeograph room and how he carried his bundles on several trips to the place where they were to be put. He told a story at the time which would indicate that he did not have any idea how the papers came to be exposed on the table in the corridor. The other place where the papers were left (without Berg being in their presence at all times) was in the room where the mimeographing was being done. Berg clearly stated that as he went off to do Morrow's work, he told Morrow to watch the papers and he also testified that there were other qualified people in the room who were able to observe whether anything happened to the papers. The leaving of the papers in the mimeograph room, therefore, did not assume any importance in the investigation and was never in issue.

The question did arise however, as to how two sets of papers happened to be on the timebook table in the corridor. In reading Exhibit " 4 ", which is Berg's account of what occurred that day, one must carefully keep in mind the fact that two different places are referred to as spots where the papers were alleged to be exposed. The only relevant question, however, relates to the corridor episode. Berg suggested that it was a very curious thing to have happened, and one might have inferred that he suspected that if the papers were where Farrell and Stern said they were, somebody interested in injuring him as keeper of the examination papers had deliberately put them there.

The inquiry at that time closed as follows: " Q. The fact is that those sheets were left there and you were in charge of the examination. Now that should not have happened. A. Well if I leave directions with my assistants and they disobey orders what can I do about it, chain them to the table. Q. The responsibility is yours absolutely, if you are in charge of the examination. A. Well can I prefer charges against my assistants for inobedience, deliberate disregard of orders? "

In relation to this statement in the answering affidavit of Commissioner Morton on this record, the Commissioner refers to this hearing as follows: "Petitioner testified at length on the entire incident, including the events leading up to and following the finding of the papers. The petitioner at that time conceded that some papers were left unguarded but charged that his assistant had disobeyed his orders in failing to safeguard them. I was convinced upon that hearing, and I so stated upon the record, that, although the petitioner may not himself have left the papers unguarded, he had been in charge of the examination and was therefore responsible for the papers having been left unguarded."

This charge in the answer is important because it introduces an ambiguous element into the situation. It is true that the petitioner conceded that the papers in the mimeograph room were left unguarded by himself personally. But he stated that the other assistants were supposed to be present. He at no time admitted that he knew of his own knowledge that two sets of papers had been left in the corridor.

About ten months later, on September 9, 1939, petitioner wrote a letter to President Kern of the Commission. His letter was a criticism in general of what he alleged to be the treatment of himself and other juniors in the Department. It was obviously a confidential intradepartmental communication. It repeated his version of the facts as to the exposed examination papers and it contained a broad hint that at least some of his coworkers were possibly conspiring to injure him.

President Kern did not answer that letter. According to Commissioner Morton, however, the matter was taken up by the Commission under the following conditions: "Petitioner's charge was considered by the members of the Commission, who recalled that the petitioner at his hearing in December, 1938, had admitted that the papers had been left unguarded. The petitioner had sought to fix the dereliction upon other persons, although he knew, as the examiner in charge of the examination, that he personally was absolutely responsible for their safeguarding. He also knew, or should have known, that that had been the sole reason why he had been suspended and found guilty. The other members of the Commission and I knew that the petitioner's letter was replete with inaccuracies and felt the petitioner was suffering from delusions of persecution. The letter seemed childish and peevish, but since the petitioner had already been penalized for this dereliction of duty it was then decided not to revive the matter."

Nothing further occurred until February 10, 1941, when petitioner was subpœnaed to appear at a public hearing before the committee of the City Council which was investigating the Municipal Civil Service Commission. The letter which the petitioner had written to President Kern was subpœnaed and the committee examined into the facts of the charge of the unguarded examination papers.

Among many questions put to him, Berg answered three questions to the ultimate dissatisfaction of the Municipal Civil Service Commissioners. That is the basis of these charges. The formal complaint is as follows:

"Well knowing the premises you gave false testimony, in response to the following question: ' Now, in fact, to the best of your knowledge were any sheets left unguarded anywhere within the sight of any of those working on the examination? ' You gave the following answer: ' None whatever.' Well knowing such answer to be false.

"In response to the following question: ' And it is in that respect that you now testify, in your opinion and to the best of your knowledge, there wasn't the slightest basis for that charge. Is that correct? ' You gave the following answer: ' To my knowledge, yes.' Such answer on your part was wilfully false.

"In response to the following question: ' Well now, after the charge was made, did Mr. Powell and Mr. Rechetnick appear on the scene all ready to prepare an examination armed with books and sources and authorities? ' You gave the following answer: ' Well, I should say yes. That's my conclusion.' Such answer on your part was wilfully false."

The third charge concerning Powell and Rechetnick's readiness to prepare a new examination was part of Berg's general feeling that certain employees were trying to injure him and eliminate him from the preparation of these examination papers. It was conclusively established at the hearing that his answer " Well, I should say yes. That's my conclusion," was a bona fide expression of his opinion. The Commissioners, therefore, withdrew that charge.

As for the first charge that Berg publicly lied when he said " None whatever " to the question as to whether to the best of his knowledge and belief any sheets were left unguarded anywhere within the sight of any of those working on the examination, the question is very ambiguous. It is susceptible of at least two interpretations, namely, " Do you know that you left the papers unguarded " or " Do you know that it was said that you left the papers unguarded."

If the question refers to the examination papers which were left in the hall, then the record is conclusive that Berg at all times took the position that he did not know how they got there. At no time did he pretend that no charge had been made at the time the papers had been left there.

If this question is to be interpreted as referring to the papers in the mimeograph room, it is apparent from the testimony that he had always taken the position that the people working on the mimeograph machines necessarily knew what was in the questions because they were setting them up. His point was at all times that there were enough assistants in the room, as he was carrying the papers to their depository, to prevent any unauthorized use of these exposed papers. We find no conflict whatsoever between the testimony given in answer to the first charge and his testimony on all other occasions when the matter under discussion was whether he knew the papers had been exposed in the corridor.

The second charge involved his statement that to his knowledge and in his opinion there was not the slightest basis for the charge that he had left the papers in the hall.

We have searched the record for any conflict on this matter, which really amounts to the same inquiry as that concerning the first charge, and we find no contradiction in the testimony given before the Commissioners and that given before the Councilmanic Committee.

There are annexed to the answering affidavit of Commissioner Morton, statements of a Mrs. Schloemer and of a Miss Shatinsky. These statements are to the effect that both of these women at between 5:10 and 5:15 P. M. on December 15, 1938, saw Berg put a large package of papers on the table next to the timebook and apparently walk off and leave them there. For reasons best known to himself at the time of the original hearing on these charges, neither Schloemer's nor Shatinsky's statement was given any credence by Commissioner Morton because he very clearly found that there had been no proof of negligence on Berg's part. The statements are open to question for other reasons besides the fact that Commissioner Morton gave them no credence in 1938. One of these is that Berg swears that he never heard of these unsworn statements until June 26, 1941, though the said charges were dated the day following the alleged negligence in 1938.

Commissioner Morton's statement that the Commission knew of these charges by Schloemer and Shatinsky at the time of the five days' suspension can only mean that he disbelieved

them. Of course, Berg, being a veteran, could not be seriously disciplined without revealing these statements if they were to be relied upon. The circumstances of the production of these statements at this late date are suspicious to say the least. But at any rate, they have played no part in the precise charges under which Berg has been dismissed from the service.

The Charter of the City of New York (§ 43) gives the Council powers of investigation. In pursuance of those powers, a Councilmanic Committee is privileged in its discretion to subpœna and question under oath civil service employees. Testimony elicited under these circumstances cannot be called public criticism of the Municipal Civil Service Commissioners and punished as such. If such statements are not deemed privileged, it is obvious that the Councilmanic Committee could be thwarted in its investigations by the constant fear of punishment which would hang over civil service employees if they happen to testify to a fact or an opinion which displeases those superiors whose conduct of their office is or may be the object of the investigation.

The situation has nothing in common with that involved in *Matter of Kern* v. *La Guardia* (264 App. Div. 627). If there is any conflict between some supposed loyalty of a civil service employee to his superiors and his duty to testify in answering questions asked by the Councilmanic Committee, the conflict must be resolved in favor of freely testifying before the body empowered to investigate under the Charter without fear of consequences.

The charges in this case could not be supported except by a tortured interpretation of the answers made as being in conflict with statements made two years earlier before the Commissioner. Witnesses under these conditions must not be subjected to the hazard of punishment because of some far-fetched and remotely possible conflict in giving personal opinions and personal interpretations of facts.

We may sum up the matter as follows: In the first place, Berg denied leaving the papers on the table. He was in effect exonerated of this charge in the first instance and punished on some theory that he was liable for the carelessness of his subordinates. He was on this record charged with falsehood for later steadfastly maintaining the truth of his original denials. If he had answered the Councilmanic Committee's questions as apparently the Commissioners think he should have answered them, he would have committed manifest perjury either before the Committee or at his original hearing.

There is nothing of substance in the record to justify the charges.

The determination of the Municipal Civil Service Commission should be annulled, with fifty dollars costs and disbursements, and the petitioner should be reinstated.

MARTIN, P. J., UNTERMYER, DORE and COHN, JJ., concur.

Determination of the Municipal Civil Service Commission unanimously annulled, with fifty dollars costs and disbursements to the petitioner, and the petitioner reinstated. Settle order on notice. [See *post*, p. 860.]